IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CT-3043-D

GREGORY BARTKO,

        Plaintiff,

v.

CLAY CAMPBELL WHEELER, et al.,

        Defendants.

**ORDER**

On November 12, 2013, in the United States District Court for the Middle District of North Carolina, Gregory Bartko ("Bartko" or "plaintiff"), a federal inmate proceeding pro se, filed this action [D.E. 2]. Bartko proceeds in forma pauperis [D.E. 15]. On December 12, 2013, Bartko filed a motion for a CM/ECF password [D.E. 6]. On January 3, 2014, Magistrate Judge L. Patrick Auld concluded that transfer of the action to this district pursuant to 28 U.S.C. § 1406(a) was appropriate [D.E. 7]. On February 10, 2014, over Bartko's objection [D.E. 8], United States District Judge James A. Beaty transferred the action to this district [D.E. 9]. On April 22, 2014, the action was reassigned to this court [D.E. 12]. On May 14, 2014, Bartko moved for recusal of the undersigned [D.E. 13]. On June 18, 2014, Bartko filed a motion for order authorizing clerk's issuance of summonses [D.E. 16]. As explained below, the court dismisses the action under 28 U.S.C. § 1915A and denies Bartko's motions.

I.

Courts must review complaints in civil actions in which prisoners seek relief from a governmental entity or officer, and dismiss a complaint if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(a), (b)(1). A case is frivolous if "it

lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). "Legally frivolous claims are based on an indisputably meritless legal theory and include claims of infringement of a legal interest which clearly does not exist." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (quotations omitted). Factually frivolous claims lack an "arguable basis" in fact. Neitzke, 490 U.S. at 325.

The standard used to evaluate the sufficiency of the pleading is flexible, and a pro se complaint,[1] "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted). Erickson, however, does not "undermine [the] requirement that a pleading contain 'more than labels and conclusions.'" Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)); see Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255–56 (4th Cir. 2009); Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009); Fed. R. Civ. P. 12(b)(6).

A brief summary of Bartko's criminal prosecution is relevant to evaluating his complaint.

> From 2004 to 2005, Bartko was the leader and organizer of a financial scheme that involved securing money from investors to provide funding for two private equity funds, the Caledonian Fund and the Capstone Fund. John Colvin, Scott Hollenbeck, Darryl Laws, Rebecca Plummer, and Levonda Leamon participated in the scheme. As a part of their scheme, the parties mailed, faxed, and e-mailed correspondence to one another and engaged in banking transactions.
>
> Bartko was a securities attorney, investment banker, and registered broker/dealer. Laws was also an investment banker who, along with Bartko, created the Caledonian Fund. Colvin was the president of Colvin Enterprises and a

---

[1] "Prior to Bartko's conviction, he practiced law for approximately 32 years, having been admitted to the bar of the states of Michigan, North Carolina and Georgia." Compl. ¶ 2; see United States v. Bartko, No. 5:09-CR-321-1-D, [D.E. 246] 5 (E.D.N.C. Jan. 17, 2012) (unpublished).

2

co-managing general partner with Scott Hollenbeck of Franklin Asset Exchange. Leamon and Plummer were financial advisors who owned and operated Legacy Resource Management (LRM).

In January 2004, Bartko was seeking investors for the Caledonian Fund. On January 15, 2004, Colvin sent to Bartko a fax regarding an investment opportunity that one of Colvin's companies, Webb Financial Services, was offering. The articles of incorporation for the company were attached. They listed Scott Hollenbeck as the initial registered agent of Webb Group. These materials made fraudulent claims that the principal and interest were guaranteed and that the investments were insured. On January 15 and 16, 2004, Bartko performed a record check on Colvin with the National Association of Securities Dealers. On February 17, 2004, he made the same record check on Hollenbeck. According to those records, both had past allegations of forgery and both had been fired from securities-related jobs. Hollenbeck's check also showed that his securities license had been suspended for violations of securities rules.

Bartko sent a fax to Laws on January 19, 2004, which detailed Colvin's fraudulent fundraising methods. For example, one page of the materials stated that "[p]rincipal investment is secured & insured [and that the] [i]nterest rate declared is guaranteed[.]" In a fax that Colvin sent to Bartko on February 9, 2004, proposing an agreement between Franklin Asset Exchange and the Caledonian Fund, Hollenbeck was referred to in the materials as a "Co–Managing General Partner" of Franklin Asset Exchange and as "the founder and creator of both Franklin Asset Exchange, LLC and The Webb Group Financial Services, Inc."

Colvin ultimately agreed to raise $3 million for the Caledonian fund through the Franklin Asset Exchange. Although the March 30, 2004, agreement to raise the money was signed by Colvin, it was Hollenbeck who actually solicited and secured the money from the individual investors.

In April 2004, the North Carolina Securities Regulatory Agency issued a cease and desist order directing Hollenbeck to stop selling securities in North Carolina. This arose from his involvement in a separate investment scheme regarding Mobile Billboards of America (Mobile Billboards). Bartko, along with his co-counsel, Wes Covington, provided legal representation to Hollenbeck on this matter. During the course of that representation, Hollenbeck provided Bartko with information concerning how he had sold the Mobile Billboards investments. Hollenbeck informed Bartko that he had promised investors that their money was guaranteed and insured. He also provided to Bartko a copy of his promotional materials, including an application for an insurance policy that he used to show that the investment was insured.

From January 15, 2004, to May 6, 2004, Hollenbeck fraudulently raised large amounts of money for the Caledonian Fund, as well as for other investments, from

3

a total of 171 investors. He then deposited the money into Franklin Asset Exchange or some similar account. The money was not separated but was instead comingled. He sent the money to various entities, as directed by Colvin.

Hollenbeck and Colvin raised $701,000 for the Caledonian Fund, which was wired to the Caledonian Fund on four separate occasions between February and May 2004. Bartko and Laws used the money to pay salaries and expenses. None of it was used for investments or loans.

In late 2004, after Colvin failed to send Bartko the $3 million that he had promised, Bartko terminated their relationship. In November 2004, the Caledonian Fund dissolved. The $701,000 in the fund was not returned to the investors.

Almost immediately after dissolution of the Caledonian Fund, Bartko began the Capstone Fund. Hollenbeck was the primary fundraiser. Nevertheless, on December 8, 2004, during a deposition with the SEC concerning Mobile Billboards, Hollenbeck was asked what investments he was currently selling. He failed to mention the Capstone Fund. Bartko and his co-counsel, Wes Covington, were at the deposition representing Hollenbeck, but neither one corrected Hollenbeck's false statement.

Although securities law disallowed it, Hollenbeck continued selling securities and raising money for the Capstone Fund through fraudulent means. Moreover, some of the investors were not accredited or sophisticated investors, as required by securities law. To be an accredited investor, one's net worth or net income must reach a certain threshold.

On January 11, 2005, Bartko met with potential investors at LRM. Around the same time as this meeting, Bartko asked Plummer and Leamon whether LRM would receive money from the Capstone Fund's investors and then send the money back to the Capstone Fund. Because the money that Hollenbeck had raised—over $1 million at that point—was fraudulently obtained and because the Capstone Fund was an unregistered fund, Bartko wanted LRM to appear to be the investor. Plummer and Leamon agreed, and on January 19, 2005, they opened a bank account with TriStone Bank for the purpose of receiving the Capstone Fund money. TriStone, however, eventually closed their account and so, at Bartko's suggestion, they opened an account with Wachovia.

Also on January 19, 2005, Bartko issued reimbursement checks to several investors. But then Bartko instructed Hollenbeck to have the investors receiving the reimbursements endorse the checks and return them to LRM. Bartko sent some of the checks to Hollenbeck to return to the investors because he did not have their addresses. Instead, Hollenbeck forged the signatures of the investors on the checks and embezzled the proceeds.

4

The money that was sent to LRM was returned to the Capstone Fund. Thus, with the exception of one individual, no refunds were actually made to the investors. All told, Bartko received $2,684,928.86 from forty Capstone Fund investors.

In February 2005, the North Carolina Secretary of State learned that Hollenbeck was continuing to sell investments for Bartko, and it advised the SEC of that fact. On March 14, 2005, Alex Rue, an attorney for the SEC, confronted Bartko. Bartko then filed an interpleader action in the Middle District of North Carolina on May 26, 2005, and ultimately returned ninety-four percent of the Capstone Fund money to the court.

Bartko eventually stood trial for conspiracy to commit mail fraud, launder money instruments, and engage in unlawful monetary transactions (Count One); mail fraud and aiding and abetting (Count Two through Count Five); and sale of unregistered securities and aiding and abetting (Count Six). The district court dismissed Counts Seven and Eight, as well as two of the objects of the conspiracy in Count One-false statements and obstructing SEC proceedings. After a thirteen-day trial, the jury convicted Bartko of the remaining counts.

United States v. Bartko, 728 F.3d 327, 332-34 (4th Cir. 2013), cert. denied, 134 S. Ct. 1043 (2014).

On January 17, 2012, this court denied Bartko's motions for a new trial, which he sought in part based on his contention that the government failed to disclose favorable evidence and knowingly permitted government witnesses to testify falsely. Bartko, No. 5:09-CR-321-1-D, [D.E. 246] 81–119. In denying Bartko's post-trial motions, this court "stresse[d] that Bartko's case was not a close one." Id. at 118. Rather,

[t]he trial record reveal[ed] overwhelming evidence of Bartko's guilt. The jury carefully heard the evidence over a three-week period. The jury received detailed jury instructions. After deliberating approximately four hours, the jury unanimously convicted Bartko on all six counts. . . .

Circumstantial this case was; tenuous, it absolutely was not. The mountain of evidence marshaled against Bartko demonstrated his guilt beyond any shadow of a doubt. Moreover, if the jury had had any doubts, Bartko's testimony destroyed them. The jury was permitted not only to disbelieve Bartko's testimony, but to believe the opposite.

Id. at 118. On April 4, 2012, the court sentenced Bartko to a total term of imprisonment of 276 months. Compl. ¶ 18; Bartko, No. 5:09-CR-321-1-D, [D.E. 260] (E.D.N.C. Apr. 4, 2012).

5

Bartko appealed his conviction and sentence on numerous grounds, including his contention that the government violated his due process rights by allowing Scott Hollenbeck to testify falsely and by failing to disclose agreements between it and the Hollenbecks and Leamon. See Bartko, 728 F.3d at 335–43. The Fourth Circuit rejected Bartko's due process claims, agreed that the evidence against Bartko was overwhelming, and affirmed Bartko's conviction and sentence. Nonetheless, in its opinion, the Fourth Circuit noted repeated instances of government discovery abuse in criminal cases in the Eastern District of North Carolina and suggested that the U.S. Attorney for the Eastern District of North Carolina take action to ensure that discovery violations do not recur. See Bartko, 728 F.3d at 341–43; see Compl. 1. The Fourth Circuit also urged "the district court in the Eastern District of North Carolina to meet with the United States Attorney's Office of that district to discuss improvements of its discovery procedures so as to prevent the abuses we have referenced here." Bartko, 728 F.3d at 342.

According to Bartko, he "brings this civil action, not to collaterally attack his conviction[2] by asserting that his constitutional rights were violated, but to recover damages, and obtain other equitable relief, proximately caused by the Defendants' obstruction of justice contrary to the common law of the state of North Carolina." Compl. 1–2; cf. Heck v. Humphrey, 512 U.S. 477, 486–87 (1994). Bartko names as defendants Clay Wheeler, the former Assistant United States Attorney who prosecuted him; George E.B. Holding and Thomas G. Walker, the former and current United States Attorneys for the Eastern District of North Carolina who Bartko contends "were responsible for the management, implementation and formation of prosecutorial guidelines and

---

[2] Bartko repeatedly describes his conviction as "wrongful." Compl. ¶¶ 18, 29, 32K, 65. Additionally, "Bartko has maintained from his indictment to the present that . . . the government has convicted and sentenced to prison an innocent person for effectively what is the remainder of his natural life." Id. ¶ 18.

6

policies within the EDNC" as well as "the training, supervision and compliance of all AUSAs employed in such capacity by the EDNC, including . . . Wheeler"; and Scott Hollenbeck, a cooperating witness and federal prisoner who testified at Bartko's trial. Compl. ¶¶ 4–6, 23–24.[3]

Bartko's complaint describes three distinct time periods.

> The "Investigation Phase" consists of the time period when Wheeler, as an AUSA for the EDNC commenced a criminal investigation of Bartko through the date of Bartko's indictment on November 4, 2009. The "Prosecution Phase" relates to the time period from the date of Bartko's indictment until Wheeler left his employment as an AUSA in the EDNC on May 31, 2011. The "Private Practice Phase" of this Complaint began when Wheeler became a limited liability partner at KTS effective June 1, 2011 through the current date.

Compl. ¶ 15. Bartko alleges that "Wheeler, and others including the Defendants, entered into a civil conspiracy to obstruct justice contrary to the common law of North Carolina ("Civil Conspiracy") and engaged in various acts of intentional obstruction of justice during all three phases described above." Id. ¶ 16. Bartko asserts three claims under North Carolina law: common law obstruction of justice against Wheeler; common law obstruction of justice against Holding and Walker; and civil conspiracy to obstruct justice against all defendants. Id. ¶¶ 31–74. Bartko seeks a declaratory judgment for obstruction of justice pursuant to 28 U.S.C. § 2201, appointment of a special master pursuant to Federal Rule of Civil Procedure 53, and "money damages against Defendants jointly and severally in an amount to which he proves to be entitled at trial, in an amount in excess of $1,450,000[.]" Id. ¶¶ 75–85 & p.26.

First, the court addresses Bartko's motion for recusal. Bartko cites "28 U.S.C. §§ 144 and/or 455(a), (b)," and requests recusal in light of the possibility that "the Court participated in ex-parte, follow-on inquiries with the government-related Defendants to abide by the Fourth Circuit Court's

---

[3] Wheeler is now in private practice. See Compl. ¶ 4. Holding is now a member of the United States House of Representatives. See id. ¶ 5.

expectations and the extent to which the Court was exposed to personally-acquired knowledge of disputed evidentiary facts related to this proceeding." Mem. Supp. Mot. Recuse [D.E. 13-1] 5; cf. Bartko, 728 F.3d at 342 ("urg[ing] the district court in the Eastern District of North Carolina to meet with the United States Attorney's Office of that district to discuss improvement of its discovery procedures so as to prevent the abuses we have referenced here"). "While Bartko is not contending that the Court has functioned as an investigator of prosecutorial misconduct associated with Bartko's Criminal Case in particular, he believes that" recusal "is prudent and warranted" because the court may "have been placed in a comparable non-judicial role for the purpose of seeking solutions to the recent discovery abuses." Mem. Supp. Mot. Recuse 10.

The Fourth Circuit recently addressed the topic of recusal and stated:

> Judicial recusals are governed by a framework of interlocking statutes. Under 28 U.S.C. § 455(a), all "judge[s] of the United States" have a general duty to "disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." In turn, the following subsection, 28 U.S.C. § 455(b), offers a list of other situations requiring recusal, one of which is where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).
>
> Section 455 speaks in the most general of terms. The Supreme Court's opinion in *Litekey v. United States*, 510 U.S. 540 (1994), provides the most complete explanation of these recusal requirements. In that case, the Court confronted a situation where defendants moved to disqualify the district judge in their criminal trial based on his comments and actions as the judge in a prior trial involving one of the same defendants. In ruling that the judge did not have to recuse himself, the Court concluded that both § 455(a) and § 455(b)(1) carry an "extrajudicial source" limitation, *id.* at 551, 554, under which bias or prejudice must, as a general matter, stem from "a source outside the judicial proceeding at hand" in order to disqualify a judge, *id.* at 545. Put differently, the bias or prejudice must "result in an opinion on the merits [of a case] on some basis other than what the judge learned from his participation in the case." *Id.* at 545 n.1 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

Belue v. Leventhal, 640 F.3d 567, 572–73 (4th Cir. 2011). "[W]hile recusal motions serve as an important safeguard against truly egregious conduct, they cannot become a form of brushback pitch

8

for litigants to hurl at judges who do not rule in their favor." Id. at 574.

A judge need not recuse "simply because of unsupported, irrational or highly tenuous speculation" or "simply because he possesses some tangential relationship to the proceedings." United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003). Likewise, a judge's familiarity with prior proceedings does not create "a basis for a bias or partiality motion unless [the judge has] display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555; see also id. at 551–52 (explaining that "opinions held by judges as a result of what they learned in earlier proceedings" in a particular case are not ordinarily a basis for recusal, given that "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant."); United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008).

In contrast, the United States Court of Appeals for the First Circuit found recusal appropriate in a case where "[a] judge's investigation of a prosecutor's office under the label of government misconduct.... poses the risk that the line will be crossed between executive and judicial roles, and between the formulation and evaluation of positions in litigation." In re U.S., 441 F.3d 44, 67 (1st Cir. 2006) (internal quotation and citation omitted); see also In re U.S., 614 F.3d 661, 665–66 (7th Cir. 2010) Additionally, the First Circuit recently required recusal on unusual facts concerning a criminal prosecution where the district judge had served in a supervisory role in the district's United States Attorney's office during the time relevant to the defendant's indictment, the defendant asserted that another prosecutor had improperly offered him immunity for his criminal activities, and "the defense's claim probably portends an enquiry into just those dealings." In re Bulger, 710 F.3d 42, 48–49 (1st Cir. 2013).

9

In seeking recusal, Bartko misapprehends this court's role in any decisions that the United States Attorney for the Eastern District of North Carolina, Thomas G. Walker, made after the Fourth Circuit's Bartko decision. "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds." In re U.S., 398 F.3d 615, 618 (7th Cir. 2005); see United States v. Struckman, 611 F.3d 560, 576 (9th Cir. 2010); cf. Bartko, 728 F.3d at 342 (referring the court's concerns to the Attorney General of the United States and the Office of Professional Responsibility for the Department of Justice by directing the Clerk of Court to serve a copy of its opinion on those entities).

Here, after Bartko, the U.S. Attorney for the Eastern District of North Carolina, Thomas G. Walker, published a revised criminal discovery policy for his office on September 6, 2013 (later revised on September 25, 2013). See www.justice.gov/usao/nce/ documents/EDNC_Criminal _Discovery_ Policy.pdf. (last visited July 18, 2014). In October 2013, at Walker's request, Walker (along with his First Assistant and Criminal Chief) appeared at this court's bench conference. At the bench conference, Walker notified the district judges of the revised criminal discovery policy for his office, changes in his staff, and additional discovery training for his staff. The district judges had no role in formulating, adopting, publishing, or approving the revised criminal discovery policy, and no role in the changes in Walker's staff or the training. Moreover, during the bench conference, Walker and his two staff members did not mention anything about the merits or substance of Bartko's criminal case. Notably, the Fourth Circuit in Bartko did not direct the court to investigate the U.S. Attorney's office, and this court did not investigate the U.S. Attorney's office. Cf. In re U.S., 441 F.3d at 66–67. Rather, the Fourth Circuit urged the district judges to meet with the U.S. Attorney's office to discuss improvements in discovery practices for future cases. During Walker's

10

statements at the bench conference, he discussed his efforts to effect such improvements. However, during the bench conference the judges of the court did not obtain any knowledge of any disputed evidentiary facts related to Bartko's criminal or civil case. (Indeed, Bartko did not file his civil case until November 12, 2013.) Thus, having considered the entire record, recusal is not warranted under 28 U.S.C. § 144 or § 455(b)(1). See 28 U.S.C. §§ 144, 455(b)(1); Liteky, 510 U.S. at 551–52; United States v. DeTemple, 162 F.3d 279, 285 (4th Cir. 1998); In re Beard, 811 F.2d 818, 829 n.16 (4th Cir. 1987); United States v. Parker, 742 F.2d 127, 128 (4th Cir. 1984). Likewise, having considered the entire record, this court's impartiality cannot "reasonably be questioned" under 28 U.S.C. § 455(a). See, e.g., Liteky, 510 U.S. at 548–56; Liljeberg v. Heath Servs. Acq. Corp., 486 U.S. 847, 855–59 (1988); DeTemple, 162 F.3d at 287–88; United States v. Black, 490 F. Supp. 2d 630, 655–68 (E.D.N.C. 2007). Accordingly, the court denies Bartko's motion to recuse.

Next, the court addresses the merits of Bartko's complaint. North Carolina does not recognize a claim for common-law obstruction of justice "against police officers based on how the officers conducted a criminal investigation." Evans v. Chalmers, 703 F.3d 636, 658 (4th Cir. 2012) (analyzing North Carolina law), cert. denied, 134 S. Ct. 98 (2013); Haynes v. City of Durham, No. 1:12cv1090, 2014 WL 2864470, at *10 (M.D.N.C. June 24, 2014) (unpublished); Massey v. Ojaniit, No. 3-11-CV-477-RJC, 2013 WL 1320404, at *6 (W.D.N.C. Mar. 29, 2013) (unpublished); cf. Heck, 512 U.S. at 486–87. The court predicts that the Supreme Court of North Carolina also would not recognize Bartko's claim for common-law obstruction of justice against prosecutors Wheeler, Holding, and Walker for "actions relating to a criminal proceeding." Evans, 703 F.3d at 658; cf. Heck, 512 U.S. at 486–87. Thus, Bartko's claims for common-law obstruction of justice against Wheeler, Holding, and Walker—which relate to their conduct as prosecutors in Bartko's criminal

11

proceeding—fail. See id.[4]

As for Bartko's common-law civil conspiracy claim against all defendants, that claim also fails. Given that North Carolina does not recognize a claim for obstruction of justice for actions relating to a criminal proceeding against prosecutors like Wheeler, Holding, and Walker, the court predicts that the Supreme Court of North Carolina would not recognize Bartko's claim for conspiracy to obstruct justice for actions related to Bartko's criminal proceeding, particularly where Bartko's conviction or sentence has not been reversed on direct appeal, expunged by executive order, or called into question by a federal court's issuance of a writ of habeas corpus. See id.; cf. Heck, 512 U.S. at 486–87. Alternatively, to state a conspiracy claim, Bartko must plausibly allege "that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy . . . ." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). Conclusory allegations of a conspiracy do not demonstrate the "meeting of the minds" element and therefore fail to state a claim. See, e.g., Simmons v. Poe, 47 F.3d 1370, 1377 (4th Cir. 1995). Bartko fails to plausibly allege a "meeting of the minds" between any of the named defendants to obstruct justice. See Iqbal, 556 U.S. at 678–79; see also Wittenberg v. First Ind. Mortg. Co., No. 12-1323, 2013 WL 3929082, at *5 (4th Cir. July 31, 2013) (per curiam) (unpublished); Wiggins v. 11 Kew Garden Crt., 497 F. App'x 262, 264 (4th Cir. 2011) (per curiam) (unpublished); Cook v. Howard, 484 F. App'x 805, 808–09 (4th Cir. 2012) (per curiam) (unpublished); A Society Without A Name v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011); Francis v. Giacomelli, 588 F.3d 186, 196–97 (4th Cir. 2009). Thus,

---

[4] In light of this conclusion, the court need not analyze immunity. See 28 U.S.C. § 1915A(b)(2); cf. Reichle v. Howards, 132 S. Ct. 2088, 2095 (2012); Rehberg v. Paulk, 132 S. Ct. 1497, 1503–07 (2012); Van de Kamp v. Goldstein, 555 U.S. 335, 343–49 (2009); Kalina v. Fletcher, 522 U.S. 118, 125–31 (1997); Buckley v. Fitzsimmons, 509 U.S. 259, 267–79 (1993); Burns v. Reed, 500 U.S. 478, 487–96 (1991); Imbler v. Pachtman, 424 U.S. 409, 420–31 (1976); Kolibash v. Comm. on Legal Ethics of W. Va. Bar, 872 F.2d 571, 574–75 (4th Cir. 1989).

12

Bartko fails to state a claim for civil conspiracy under North Carolina law. Accordingly, the court dismisses the action under 28 U.S.C. § 1915A.

Bartko may challenge his conviction by filing a petition pursuant to 28 U.S.C. § 2255. However, a "court cannot . . . recharacterize a pro se litigant's motion as the litigant's first [section] 2255 motion unless the court informs the litigant of its intent to recharacterize, warns the litigant that the recharacterization will subject subsequent [section] 2255 motions to the law's 'second or successive' restrictions, and provides the litigant with an opportunity to withdraw, or to amend, the filing." Castro v. United States, 540 U.S. 375, 377 (2003) (emphasis omitted); see United States v. Blackstock, 513 F.3d 128, 134–35 (4th Cir. 2008). The court also informs Bartko that second or successive motions under section 2255 generally are prohibited, and would have to be certified by a panel of the appropriate court of appeals under limited circumstances. See 28 U.S.C. § 2255(h). Certification for second or successive motions to vacate rarely is granted. Finally, the court informs Bartko that the Antiterrorism and Effective Death Penalty Act provides that section 2255 motions generally must be filed within one year of the criminal judgment. See 28 U.S.C. § 2255(f). The court directs the clerk to send Bartko a form section 2255 petition.

II.

In sum, the court DISMISSES Bartko's action under 28 U.S.C. § 1915A, and DENIES the pending motions [D.E. 6, 13, 16]. The clerk shall close the case, and shall send Bartko a section 2255 form and a copy of this order.

SO ORDERED. This 18 day of July 2014.

JAMES C. DEVER III
Chief United States District Judge

13